| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Room 256<br>Denver, Colorado 80202 | DATE FILED: February 16, 2022 10:54 PM<br>FILING ID: C3A5DE59EA63D<br>CASE NUMBER: 2022CV30449 |
| **IAN MOLL**; **JASEN JOHNSTON**; and **CHRISTOPHER CURTIS**<br>    Plaintiffs,<br><br>v.<br><br>**WESTERN OILFIELDS SUPPLY COMPANY, d/b/a RAIN FOR RENT**, a foreign corporation; **PREMIER PUMP & POWER LLC**, a foreign limited liability company; and **DEERE & COMPANY, d/b/a JOHN DEERE COMPANY, INC.**, a foreign corporation.<br>    Defendants. | ▲ Court Use Only ▲ |
| Matthew M. Holycross, Reg. No. 40463<br>SPRINGER & STEINBERG, P.C.<br>1600 Broadway, Suite 1200<br>Denver, Colorado 80202<br>Telephone:  (303) 861-2800<br>Facsimile:  (303) 832-7116<br>E-mail: mholycross@springersteinberg.com<br>*Counsel for Plaintiffs* | Case Number:<br><br>Division: |
| **COMPLAINT FOR DAMAGES AND JURY DEMAND** ||

Plaintiffs, Ian Moll, Jasen Johnston, and Christopher Curtis, by and through their counsel of record, the law firm of Springer & Steinberg, P.C., for their Complaint for Damages and Jury Demand against Defendants Western Oilfields Supply Company, d/b/a Rain for Rent, Premier Pump & Power LLC, and Deere & Company, d/b/a John Deere Company, Inc., states and alleges as follows:

## I. PARTIES

1. Plaintiff Ian Moll ("Moll") is a natural person and resident of the state of Colorado, residing at 712 Mt. Evans Avenue, Severance, Colorado 80550.

EXHIBIT A

2. Plaintiff Jasen Johnston ("Johnston") is a natural person and resident of the state of Colorado, residing at 15313 E. 100th Court, Commerce City, Colorado 80022.

3. Plaintiff Christopher Curtis ("Curtis") is a natural person and resident of the state of Colorado, residing at 1543 Brandt Street, Berthoud, Colorado 80513.

4. Defendant Western Oilfields Supply Company, d/b/a Rain for Rent ("RFR") is a foreign corporation licensed and organized under the laws of the state of Delaware, and at all times relevant, was authorized to do business and was doing business in the state of Colorado.

5. RFR's principal place of business is 3404 State Road, Bakersfield, California, 93308.

6. RFR's registered agent is C T Corporation System, located at 7700 E. Arapahoe Rd, Ste 220, Centennial, Colorado 80112-1268.

7. Upon information and belief, RFR is in good standing.

8. Defendant Premier Pump & Power LLC ("Premier") is a foreign limited liability company licensed and organized under the laws of the state of Washington, and at all times relevant, was authorized to do business and was doing business in the state of Colorado.

9. Premier's principal place of business is 7600 NE 47th Avenue, Vancouver, Washington 98661-1343.

10. Premier's registered agent is William J. Scholtes, located at 7600 NE 47th Avenue, Vancouver, Washington 98661-1343.

11. Upon information and belief, Premier is active and in good standing.

12. Defendant Deere & Company, d/b/a John Deere ("Deere") is a foreign corporation licensed and organized under the laws of the state of Delaware, and at all times relevant, was authorized to do business and was doing business in the state of Colorado.

13. Deere's principal place of business is One John Deere Place, Moline, Illinois 61265.

14. Deere's registered agent is C T Corporation System, located at 7700 E. Arapahoe Rd, Ste 220, Centennial, Colorado 80112-1268.

15. Upon information and belief, Deere is in good standing.

## II. Jurisdiction and Venue

16. Upon information and belief, none of the Defendants are residents of or domiciled in the state of Colorado.

17. The District Court has subject matter jurisdiction over the allegations in this Complaint as a court of general jurisdiction, pursuant to Section 13-1-124, C.R.S.

18. A cause of action exists under Colorado state law for claims regarding the conduct complained of herein.

19. The District Court has personal jurisdiction over the parties to this action because Plaintiffs are domiciled in Colorado and Defendants were authorized to and did in fact conduct business in the state of Colorado.

20. Venue in the City and County of Denver, Colorado is proper pursuant to C.R.C.P. 98(c)(1) because Defendants are not domiciled in Colorado and this Complaint designates the City and County of Denver as the proper venue, given its central location within the state for counsel and all parties to appear if and when necessary.

## III. General Allegations

21. Plaintiffs incorporate by reference all of the allegations contained in the paragraphs above, as if fully set forth herein.

22. As of February 16, 2020, Plaintiffs were employees of Reliance Oilfield Services, LLC ("Reliance").

23. Reliance is a company that provides oil and gas field wireline services at oil fields throughout Colorado.

24. Starting on or about February 9, 2020, Reliance was providing wireline services at real property identified as the "Noble Pad", located at or near the Gutterson Ranch in Weld County, Colorado (the "Pad").

25. Plaintiffs, as part of their employment with Reliance, were performing wireline services for Reliance at the Pad between approximately February 9, 2020 to February 16, 2020.

26. On February 16, 2020, Plaintiffs started their shift for that day at approximately 4:15 p.m. at the Reliance shop in Platteville, Colorado.

27. Plaintiffs arrived at the Pad at approximately 5:00 p.m. on February 16, 2020 to begin work at the Pad that evening.

28. Part of the job responsibilities for Plaintiffs at the Pad included performing work within a trailer that was parked and situated on the Pad (the "Trailer").

29. Despite the low evening temperatures at the Pad during February 2020, the Trailer did not have its own source of heat.

30. Accordingly, upon information and belief, heat was supplied to and pumped into the Trailer through use of a flameless heater (the "Heater").

31. Upon information and belief, the subject Heater at the Pad on February 16, 2020 was manufactured by Premier.

32. Upon information and belief, RFR purchased and/or leased the Heater from Premier to then rent the Heater to Reliance to use at the Pad prior to and on February 16, 2020 to supply heat to the Trailer while Plaintiffs and other wireline workers were working within the Trailer.

33. Among other mechanical components, the Heater consisted of a flooded lead acid (wet cell) battery (the "Battery") and alternator (the "Alternator") housed in a cavity and covered by metal access doors.

34. Upon information and belief, the Battery consisted of approximately six cells with a liquid electrolyte solution of sulfuric acid and water.

35. Upon information and belief, the Alternator was manufactured by Deere.

36. Upon information and belief, the Battery and Alternator worked in combination to generate electricity and power to run the Heater, which allowed the Heater to produce heated air to then be pumped into the Trailer.

37. Once operating and powered by the Battery and Alternator, the Heater pumped the heated air through a tube from the Heater to the Trailer, heating the inside of the Trailer.

38. Although cold on February 16, 2020, the sun was out when the Plaintiffs arrived to the Pad for their shift that evening, so Plaintiffs had the Heater on a low setting so that it was blowing heated air into the Trailer, but not at a high rate.

39. Not long into their shift on February 16, 2020, as the outside air temperature dropped, Plaintiffs opened the interior Trailer vent a little more to effectively turn up the heat to further warm the inside of the Trailer.

40. While Plaintiffs were performing their work duties within the Trailer, they noticed a foul smell and began experiencing headaches and other symptoms.

41. As their shift continued, the smell became worse and the headaches increased in intensity.

42. During their shift on February 16, 2020, Plaintiffs eventually left the Trailer to perform necessary wireline work outside of the Trailer.

43. Since the air temperature had dropped considerably, before the exited the Trailer to perform outside tasks, Plaintiffs opened the interior Trailer vent all the way so that when they got back to the Trailer after performing their outside tasks, the Trailer would be warm.

44. When they returned to the Trailer after performing their outside tasks, the foul smell was still present and their headaches and other symptoms continued to intensify.

45. After returning to the Trailer from performing their outside tasks, Plaintiffs continued working in the Trailer for approximately another 30 to 45 minutes.

46. After this period, Plaintiffs could still smell the foul odor and still had headaches and other symptoms.

47. Upon information and belief, it was at this time that Curtis or one of the Plaintiffs indicated that he thought that the foul smell may have been coming from the vent that brought the heated air into the Trailer from the Heater and through the tubes.

48. Upon information and belief, Curtis or one of the other Plaintiffs put an H2S monitor inside the vent and the tube coming into the Trailer from the Heater.

49. The H2S monitor showed H2S at a level of approximately 140 parts per million.

50. Believing that such a reading was extremely high, Plaintiffs immediately contacted their supervisor to alert him of the situation.

51. Plaintiffs then evacuated the Trailer and went outside; even while outside, Plaintiffs' headaches and other symptoms continued to intensify.

52. While outside, Plaintiffs recall the shop mechanic indicating that he had looked the Heater over after seeing that Plaintiffs were not feeling well and that the Battery was bubbling, melting, and smoking.

53. Upon information and belief, the Heater and/or some of its components, including the Battery and/or Alternator, were not working properly on February 16, 2020 and as a result, the Battery burned off the available sulfuric acid within the cells, creating hydrogen sulfide gas.

54. Upon information and belief, the hydrogen sulfide gas was then blown from the interior of the Heater, through the heating tube, threw the vent, and into the Trailer where Plaintiffs were working on February 16, 2020.

55. Plaintiffs had been working in the Trailer on February 16, 2020 for no less than two hours, and the accumulation of hydrogen sulfide gas within the Trailer on that date poisoned Plaintiffs, causing the to experience severe injuries (the "Incident").

56. Upon information and belief, the issues with the Heater and/or its components that caused the Battery to burn off sulfuric acid to create hydrogen sulfide gas and then pump that toxic gas into the Trailer persisted for at least the week that Plaintiffs worked at the Pad, and culminated in the February 16, 2020 poisoning of Plaintiffs.

57. Plaintiffs did not contribute to or cause the Incident.

58. Plaintiffs could not have prevented the Incident.

59. Plaintiffs could not have known that the Incident was imminent.

60. Plaintiffs did not contribute to or cause their injuries and damages.

61. Plaintiffs acted reasonably under the circumstances.

## IV. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Negligence against Defendants RFR, Premier, and Deere)

62. Plaintiffs incorporate by reference all of the allegations contained in the paragraphs above, as if fully set forth herein.

63. Defendants owed a duty to foreseeable users of the Heater and/or its component parts, including the Battery and/or Alternator, to exercise reasonable care to ensure that the Heater, Battery, and/or Alternator were maintained and repaired in a manner that would not subject others to an unreasonable risk of danger.

64. Plaintiffs were foreseeable users of the Heater as employees of Reliance and workers on the Pad, given that they were charged with the responsibility of working in the Trailer without heat during the winter months in Colorado.

65. Defendants breached the duty owed to Plaintiffs by, *inter alia*, failing to properly maintain and repair the Heater and its components, including the Battery and/or Alternator to avoid the Battery from burning off large amounts of sulfuric acid, creating dangerous amounts of hydrogen sulfide gas that the Heater then pumped into the Trailer where Plaintiffs were working.

66. Defendants' breach of the duty owed to Plaintiffs was unreasonable and therefore negligent.

67. As a direct and proximate result of Defendants' negligence, Plaintiffs sustained damages and injuries.

68. As a direct and proximate result of Defendants' negligence, Plaintiffs sustained serious bodily injuries, physical impairments, physical disfigurement, pain and suffering, physical disability, loss of enjoyment of life, physical and mental suffering, emotional distress, anxiety, and depression, which damages are in an amount to be determined at the time of trial.

69. As a direct and proximate result of Defendants' negligence, Plaintiffs incurred medical and rehabilitation expenses in the past and will likely incur medical and rehabilitation expenses in the future, in an amount to be determined at the time of trial.

70. As a direct and proximate result of Defendants' negligence, Plaintiffs sustained a loss of past and future income, including a loss of earning capacity, which damages are in an amount to be determined at the time of trial.

71. Because of Defendants' negligence, Plaintiffs are entitled to recover all of their damages and losses in amounts to be determined at the time of trial.

WHEREFORE, Plaintiffs, Ian Moll, Jasen Johnston, and Christopher Curtis, pray for judgment in their favor and against Defendants RFR, Premier, and Deere for general and special damages as proven at trial, pre-judgment interest from the date of the February 16, 2020 Incident, post-judgment interest as provided for by law, costs, expert witness fees and all other damages to be determined at trial, and for such other and further relief as the Court deems just and proper in the premises.

## SECOND CLAIM FOR RELIEF
### (Strict Liability – Manufacturing Defect against Premier)

72. Plaintiffs incorporate by reference all of the allegations contained in the paragraphs above, as if fully set forth herein.

73. Upon information and belief, Defendant Premier assembled and otherwise manufactured the Heater and/or the various components of the Heater, including installing and/or assembling the interior components of the Heater, including the Battery and Alternator.

74. Accordingly, Premier is a manufacturer of the Heater, as identified in Colorado's Product Liability Act.

75. Upon information and belief, the Heater and/or its components were manufactured by Premier in a manner that caused this specific Heater to overwork the Battery to the point where the Battery burnt off sulfuric acid and created hydrogen sulfide that could be pumped from the Heater into the space being heated, making the Heater defective and unreasonably dangerous as manufactured.

76. The Heater and its component parts were defective at the time that Premier manufactured it so as to be unreasonably dangerous and create a substantial risk of harm to consumers and foreseeable users, including, without limitation, Plaintiffs.

77. Such manufacturing defects in the Heater were not ordinary or expected.

78. When the assembled Heater left Premier's possession, or when the Heater was assembled and its components, including the Battery and Alternator, were installed within the Heater, it was manufactured in a defective condition and was unreasonably dangerous for its intended use by foreseeable users, including, without limitation, Plaintiffs.

79. Premier's defective manufacture of the Heater used at the Pad was a proximate cause of the Incident.

80. As a direct and proximate result of Premier's manufacturing defect, Plaintiffs sustained damages and injuries.

81. As a direct and proximate result of Premier's manufacturing defect, Plaintiffs sustained serious bodily injuries, physical impairments, physical disfigurement, pain and suffering, physical disability, loss of enjoyment of life, physical and mental suffering, emotional distress, anxiety, and depression, which damages are in an amount to be determined at the time of trial.

82. As a direct and proximate result of Premier's manufacturing defect, Plaintiffs incurred medical and rehabilitation expenses in the past and will likely incur medical and rehabilitation expenses in the future, in an amount to be determined at the time of trial.

83. As a direct and proximate result of Premier's manufacturing defect, Plaintiffs sustained a loss of past and future income, including a loss of earning capacity, which damages are in an amount to be determined at the time of trial.

84. Because of Premier's manufacturing defect, Plaintiffs are entitled to recover all of their damages and losses in amounts to be determined at the time of trial.

85. WHEREFORE, Plaintiffs, Ian Moll, Jasen Johnston, and Christopher Curtis, pray for judgment in their favor and against Defendant Premier for general and special damages as proven at trial, pre-judgment interest from the date of the February 16, 2020 Incident, post-judgment interest as provided for by law, costs, expert witness fees and all other damages to be determined at trial, and for such other and further relief as the Court deems just and proper in the premises.

### THIRD CLAIM FOR RELIEF
### (Strict Liability – Manufacturing Defect against Deere)

86. Plaintiffs incorporate by reference all of the allegations contained in the paragraphs above, as if fully set forth herein.

87. Upon information and belief, Defendant Deere assembled and otherwise manufactured various components of the Heater, including installing and/or assembling the interior components of the Heater, including the Alternator.

88. Accordingly, Deere is a manufacturer of the Heater's components, as identified in Colorado's Product Liability Act.

89. Upon information and belief, the Alternator was manufactured by Deere in a manner that caused this specific Heater and Alternator to overwork the Battery to the point where the Battery burnt off sulfuric acid and created hydrogen sulfide that could be pumped from the Heater into the space being heated, making the Alternator defective and unreasonably dangerous as manufactured.

90. The Alternator was defective at the time that Deere manufactured it so as to be unreasonably dangerous and create a substantial risk of harm to consumers and foreseeable users, including, without limitation, Plaintiffs.

91. Such manufacturing defects in the Alternator were not ordinary or expected.

92. When the assembled Alternator left Deere's possession, or when the Alternator was assembled and installed within the Heater, it was manufactured in a defective condition and was unreasonably dangerous for its intended use by foreseeable users, including, without limitation, Plaintiffs.

93. Upon information and belief, Deere's defective manufacture of the Alternator installed within the Heater was a proximate cause of the Incident.

94. As a direct and proximate result of Deere's manufacturing defect, Plaintiffs sustained damages and injuries.

95. As a direct and proximate result of Deere's manufacturing defect, Plaintiffs sustained serious bodily injuries, physical impairments, physical disfigurement, pain and suffering, physical disability, loss of enjoyment of life, physical and mental suffering, emotional distress, anxiety, and depression, which damages are in an amount to be determined at the time of trial.

96. As a direct and proximate result of Deere's manufacturing defect, Plaintiffs incurred medical and rehabilitation expenses in the past and will likely incur medical and rehabilitation expenses in the future, in an amount to be determined at the time of trial.

97. As a direct and proximate result of Deere's manufacturing defect, Plaintiffs sustained a loss of past and future income, including a loss of earning capacity, which damages are in an amount to be determined at the time of trial.

98. Because of Deere's manufacturing defect, Plaintiffs are entitled to recover all of their damages and losses in amounts to be determined at the time of trial.

99. WHEREFORE, Plaintiffs, Ian Moll, Jasen Johnston, and Christopher Curtis, pray for judgment in their favor and against Defendant Deere for general and special damages as proven at trial, pre-judgment interest from the date of the February 16, 2020 Incident, post-judgment interest as provided for by law, costs, expert witness fees and all other damages to be determined at trial, and for such other and further relief as the Court deems just and proper in the premises.

### FOURTH CLAIM FOR RELIEF
### (Strict Liability – Failure to Warn against Premier)

100. Plaintiffs incorporate by reference all of the allegations contained in the paragraphs above, as if fully set forth herein.

101. Upon information and belief, Defendant Premier assembled and otherwise manufactured the Heater and/or the various components of the Heater, including installing and/or assembling the interior components of the Heater, including the Battery and Alternator.

102. Accordingly, Premier is a manufacturer of the Heater, as identified in Colorado's Product Liability Act.

103. Upon information and belief, the Heater had a propensity to overwork the Battery to the point where the Battery burnt off sulfuric acid and created hydrogen sulfide that could be pumped from the Heater into the space being heated.

104. The Heater, because of this propensity, possessed inherent dangers within itself or in its intended use.

105. Premier did not give sufficient or adequate warnings to end users of the Heater, including Plaintiffs, that the Heater possessed inherent dangers within itself or in its intended use.

106. Specifically, Premier did not warn end users that the Heater had a propensity to overwork the Battery to the point where the Battery burnt off sulfuric acid and created hydrogen sulfide that could be pumped from the Heater into the space being heated, creating a danger of hydrogen sulfide poisoning.

107. Premier's failure to sufficiently and adequately warn end users of the inherent dangers within the Heater or in its intended use rendered the Heater unreasonably dangerous, and therefore, defective.

108. Premier's failure to warn Plaintiffs or others of the Heater's inherent dangers was a proximate cause of the Incident

109. As a direct and proximate result of Premier's failure to warn of the unreasonably dangerous nature of the Heater and its components, Plaintiffs sustained damages and injuries.

110. As a direct and proximate result of Premier's failure to warn of the unreasonably dangerous nature of the Heater and its components, Plaintiffs sustained serious bodily injuries, physical impairments, physical disfigurement, pain and suffering, physical disability, loss of enjoyment of life, physical and mental suffering, emotional distress, anxiety, and depression, which damages are in an amount to be determined at the time of trial.

111. As a direct and proximate result of Premier's failure to warn of the unreasonably dangerous nature of the Heater and its components, Plaintiffs incurred medical and rehabilitation expenses in the past and will likely incur medical and rehabilitation expenses in the future, in an amount to be determined at the time of trial.

112. As a direct and proximate result of Premier's failure to warn of the unreasonably dangerous nature of the Heater and its components, Plaintiffs sustained a loss of past and future income, including a loss of earning capacity, which damages are in an amount to be determined at the time of trial.

113. Because of Premier's failure to warn of the unreasonably dangerous nature of the Heater and its components, Plaintiffs are entitled to recover all of their damages and losses in amounts to be determined at the time of trial.

114. WHEREFORE, Plaintiffs, Ian Moll, Jasen Johnston, and Christopher Curtis, pray for judgment in their favor and against Defendant Premier for general and special damages as proven at trial, pre-judgment interest from the date of the February 16, 2020 Incident, post-judgment interest as provided for by law, costs, expert witness fees and all other damages to be determined at trial, and for such other and further relief as the Court deems just and proper in the premises.

### SIXTH CLAIM FOR RELIEF
**(Strict Liability – Design Defect against Premier)**

115. Plaintiffs incorporate by reference all of the allegations contained in the paragraphs above, as if fully set forth herein.

116. Upon information and belief, Defendant Premier assembled and otherwise manufactured the Heater and/or the various components of the Heater, including installing and/or assembling the interior components of the Heater, including the Battery and Alternator.

117. Accordingly, Premier is a manufacturer of the Heater, as identified in Colorado's Product Liability Act

118. Upon information and belief, Premier was engaged in the business of selling the Heater.

119. Upon information and belief, Premier designed how the Heater's components would be assembled and determined how the Heater's components would work together.

120. Upon information and belief, Premier assembled the Heater and its components, including the Battery and Alternator.

121. The Heater was expected to, and did, reach Plaintiffs, as end users or consumers, without substantial change in the condition in which it was originally sold to RFR.

122. Upon information and belief, Premier sold the Heater to RFR, who then rented, leased, or sold the Heater to Reliance to be used at the Pad.

123. Plaintiffs, as employees of Reliance and workers at the Pad and within the Trailer, were permissive and foreseeable end users or consumers of the Heater manufactured by Premier.

124. The Heater was defective and unreasonably dangerous at the time that Premier sold the Heater to RFR because, upon information and belief, the Heater had a propensity to overwork the Battery to the point where the Battery burnt off sulfuric acid and created hydrogen sulfide that could be pumped from the Heater into the space being heated.

125. Premier's defective design of the Heater used at the Pad was a proximate cause of the Incident

126. As a direct and proximate result of Premier's design defect, Plaintiffs sustained damages and injuries.

127. As a direct and proximate result of Premier's design defect, Plaintiffs sustained serious bodily injuries, physical impairments, physical disfigurement, pain and suffering, physical disability, loss of enjoyment of life, physical and mental suffering, emotional distress, anxiety, and depression, which damages are in an amount to be determined at the time of trial.

128. As a direct and proximate result of Premier's design defect, Plaintiffs incurred medical and rehabilitation expenses in the past and will likely incur medical and rehabilitation expenses in the future, in an amount to be determined at the time of trial.

129. As a direct and proximate result of Premier's design defect, Plaintiffs sustained a loss of past and future income, including a loss of earning capacity, which damages are in an amount to be determined at the time of trial.

130. Because of Premier's design defect, Plaintiffs are entitled to recover all of their damages and losses in amounts to be determined at the time of trial.

131. WHEREFORE, Plaintiffs, Ian Moll, Jasen Johnston, and Christopher Curtis, pray for judgment in their favor and against Defendant Premier for general and special damages as proven at trial, pre-judgment interest from the date of the February 16, 2020 Incident, post-judgment interest as provided for by law, costs, expert witness fees and all other damages to be determined at trial, and for such other and further relief as the Court deems just and proper in the premises.

## V. JURY DEMAND

Plaintiffs hereby demand a trial to a jury of six (6) concerning all issues so triable.

DATED February 16, 2020.

Respectfully submitted,

SPRINGER & STEINBERG, P.C.

By: ___/s/ Matthew M. Holycross___
Matthew M. Holycross, Esq.
*Counsel for Plaintiffs*

Plaintiffs' Addresses:
Ian Moll:  712 Mt. Evans Avenue, Severance, Colorado 80550
Jasen Johnston:  15313 E. 100th Court, Commerce City, Colorado 80022
Christopher Curtis:  1543 Brandt Street, Berthoud, Colorado 80513